UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CALEDONIAN BANK & TRUST
LIMITED,

    Plaintiff,

v.                                              Case No: 8:13-cv-1470-T-36TGW

FIFTH THIRD BANK,

    Defendant.
_____/

## **ORDER**

This cause comes before the Court upon the Defendant Fifth Third Bank's ("Fifth Third") Motion for Summary Judgment (Doc. 104). Plaintiff Caledonian Bank & Trust Limited, as trustee for and on behalf of Vicis Capital Master Fund ("Vicis"), responded in opposition to the Motion (Doc. 126). Fifth Third replied in further support of its Motion (Doc. 165). On May 12, 2015, the Court held oral argument on the Motion. Fifth Third subsequently filed a Notice of Supplemental Authority. *See* Doc. 192. The Court, having considered the parties' submissions and oral argument, and being fully advised in the premises, will now GRANT Fifth Third's Motion.

**I.**    **STATEMENT OF FACTS[1]**

This litigation arises out of two ill-fated investments made by Vicis in certain business entities founded and operated by the Khan family. Those entities (collectively referred to as the "QHP Entities") are:

- Quality Health Plans, Inc. ("QHP-FL"), a Florida HMO regulated by the Florida Office of Insurance Regulation ("FOIR") and Federal Centers for Medicare and

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, stipulated facts, affidavits, and deposition testimony.

    Medicaid Services ("CMS"), which in January 2008 became a wholly owned subsidiary of QHP Group, Inc. ("QHP Group"), a Florida corporation, *see* Doc. 162 ¶¶ 1, 3; and

- Quality Health Plans of New York, Inc. ("QHP-NY"), an HMO regulated by New York's Department of Insurance and CMS that was wholly owned by QHP Financial Group, Inc. ("QHP Financial"), a Florida corporation, *see id.* ¶ 4

 Vicis was an investment fund that came to be involved with the QHP Entities as follows: In the fall of 2007 until early 2008, Chris Phillips was an officer and part owner of Midtown Partners & Co., a broker-dealer that focused on private investments in publicly traded companies and public equity. Doc. 114 ("Phillips Dep.") at 14-17. At that time, the Khans had been in contact with Phillips to seek a potential investor for QHP Group and QHP-FL. *Id.* at 38-42. In February 2008, Phillips joined Vicis as its managing director of private placement. *Id.* at 10, 202. After Phillips joined Vicis, Midtown approached Vicis to solicit the proposed investment, with Phillips being primarily responsible for Vicis' due diligence in the proposed investment. *Id.* at 41; Doc. 117 ("Stastney Dep.") at 43.

 Allegedly unbeknownst to Vicis, QHP-FL was not a thriving entity at that time, but rather had been in continuous violation of Florida's statutory requirement to maintain surplus capital. Doc. 118-1 ("Buttner Rpt.") at 76-78. QHP-FL's statutory insolvency, however, had been concealed by the Khans through a series of loans it obtained from Fifth Third beginning in May 2007. These loans were structured such that QHP-Group would be the borrower of the loans, but QHP-FL would hold the loan proceeds in accounts maintained by Fifth Third in QHP-FL's name. Doc. 144 ("Kimes Dep.") at 32, 39-40, 73, 269; Doc. 139 ("Ruszkowski Dep.") at 138. Further,

the loan proceeds would be permanently and secretly blocked, and could only be used to pay back the loans. Kimes Dep. at 73, 281.

The alleged sham-loan scheme allowed QHP-FL to appear to be properly capitalized to QHP-FL's auditor. Exs. 7, 71, 79 to Kimes Dep.; Ex. A to Doc. 130 ("Banker Decl."). Fifth Third actively contributed to the deception by failing to disclose to QHP-FL's auditor that the funds in QHP-FL's accounts were actually permanently blocked loan proceeds that belonged to Fifth Third. Exs. 15-17, 43-44 to Doc. 141 ("White Dep.").

The Khans also falsely reported QHP-FL's profits. Specifically, the Khans improperly claimed receivables from services that had been delivered years earlier and receivables from certain risk-sharing contracts, receivables that FOIR subsequently forced the Khans to write off. Ex. G to Banker Decl.

In April 2008, Vicis, allegedly misled by QHP-FL's audited financial statements, invested $20 million in QHP Group for QHP-FL's benefit in exchange for preferred stock of QHP Group. Doc. 111 ("Jones Dep.") at 150-51. Additionally, in November 2009, Vicis invested $10 million in QHP Financial for QHP-NY's benefit in exchange for preferred stock in QHP Financial. Doc. 113 ("Succo Dep.") at 118; Stastney Dep. at 96-97.

QHP Group's financial condition deteriorated following Vicis' initial investment. A number of factors contributed to this decline, including overall harsh economic conditions, the fact that CMS suspended QHP-FL from the Medicare program, and poor management on the part of the Khans. Ex. A to Doc. 115 ("Jacobson Decl.") at 27-30; Stastney Dep. at 81-82, 85-87. In all, from 2008 to 2011, QHP Group suffered over $35 million in operating losses. Ex. A to Jacobson Decl. at 30.

During this time, Fifth Third continued to help QHP-FL misrepresent its surplus compliance. Specifically, in July 2009, Fifth Third purported to issue a $3 million letter of credit for QHP-FL. Ex. 4 to Doc. 142 ("Gleason Dep."). In exchange for the letter, however, QHP-FL was required to grant a block on a securities brokerage account it maintained with Fifth Third Securities, Inc., the value of which always exceeded Fifth Third's exposure under the letter. Exs. 4-10 to Gleason Dep. As it had previously done, Fifth Third failed to disclose in its audit confirmation responses the encumbered nature of the funds. Exs. 47-48, 50 to White Dep.

The scheme began to unravel when, in early 2011, QHP-FL's creditor drew on the letter of credit, prompting Fifth Third to withdraw $3 million in funds from the brokerage account, thereby rendering QHP-FL insolvent. Exs. 28-32 to Gleason Dep.; Doc. 129 ("Wilkerson Aff.") ¶ 4. QHP-FL was forced to obtain substitute funding, and, in April 2011, indicated to FOIR that it had received an additional capital infusion from Lincoln Reserve Group. Wilkerson Aff. ¶ 4. After FOIR notified QHP-FL that it would need written confirmation of the funds, QHP-FL faxed to FOIR an account statement that purported to show the balance of the Lincoln Reserve Group loan in one of QHP-FL's accounts. *Id.* FOIR, however, determined that the bank statement had been fabricated and that QHP-FL was insolvent, and caused liquidation proceedings to be brought against QHP-FL. *Id.* ¶¶ 4-5; Doc. 106-1.[2] The Khans were subsequently arrested for fraud. Docs. 132, 133.[3]

Seeking to recover the loss suffered on its investments, Vicis filed the instant action. In the Amended Complaint, Vicis alleges that Fifth Third aided and abetted fraud (Count I) and

---

[2] The Court has taken judicial notice of the Order Appointing the Florida Department of Financial Services as Receiver in *State of Florida v. Quality Health Plans, Inc*, Case No. 2011-CA-002245.

[3] The Court has taken judicial notice of Amended Informations filed in three Leon County Circuit Court cases pertaining to Sabiha Kahn, Nazeer Kahn, and Haider Kahn.

conspired to commit fraud (Count II). Doc. 15. Fifth Third now moves for summary judgment. Doc. 104.

## II.     LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 Fed. App'x 852, 858 (11th Cir. 2006).

**III. DISCUSSION**

In order to recover on a claim for aiding and abetting fraud or conspiracy to commit fraud, a plaintiff must prove the elements of the underlying fraud. *See ZP No. 54 Ltd. P'ship v. Fidelity and Deposit Co. of Maryland*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005). The elements of a fraud claim are: "(1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the party acting in reliance on the representation." *Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 991 (Fla. 4th DCA 2003) (quotation marks, citation, and emphasis omitted). It is fundamental that actual damages and the measure of those damages are essential to establishing a claim of fraud. "Without proof of actual damage the fraud is not actionable." *Morgan Stanley & Co. v. Coleman (Parent) Holdings Inc.*, 955 So.2d 1124, 1132 (Fla. 4th DCA 2007) (citations omitted). Damage goes to the very essence of an action for fraud.

Fifth Third argues that it is entitled to judgment as a matter of law because Vicis has failed to establish the elements of fraud: any misrepresentation it made regarding the blocked status of the loans was not material; Vicis did not rely on the alleged misrepresentations; the alleged misrepresentations did not proximately cause any loss in value of the purchased stock; and Vicis lacks competent evidence as to the amount of damages it allegedly suffered as a result of the misrepresentations. In response, Vicis notes that Fifth Third incorrectly characterizes its case as being limited to the specific misrepresentations Fifth Third made in connection with the loans it issued to QHP Group and QHP-FL. Rather, according to Vicis, its case is premised on the fact that Fifth Third's alleged misrepresentations allowed QHP-FL to appear as a legitimate HMO when in actuality it was nothing but a "criminal enterprise." Vicis asserts that Fifth Third's misrepresentations were material; that it relied on Fifth Third's misrepresentations; that Fifth

6

Third's misrepresentations proximately caused its losses; and that it has evidence sufficient to establish that the amount of damages it suffered was its entire investment of $30 million.

After careful consideration, the Court agrees that Fifth Third is entitled to judgment as a matter of law because Vicis lacks competent evidence regarding the amount of damages it suffered as a result of the alleged fraud. "Under the 'flexibility theory' of damages followed in Florida, a defrauded party is entitled to the measure of damages that will fully compensate him." *Morgan Stanley*, 955 So. 2d at 1128. Florida courts therefore allow two standards for measuring damages in a fraud case—the "out of pocket" rule, or the "benefit of the bargain" rule, depending on which is more likely to fully compensate the injured party. *See Totale, Inc. v. Smith*, 877 So. 2d 813, 815 (Fla. 4th DCA 2004). The "out of pocket" rule applies where "the defrauded party is content with the recovery of only the amount he actually lost." *Id.* (quoting *DuPuis v. 79th Street Hotel, Inc.*, 231 So. 2d 532, 536 (Fla. 3d DCA 1970)). On the other hand, the "benefit of the bargain" rule applies "if the fraudulent representation also amounts to a warranty." *Id.* (quoting *DuPuis*, 231 So. 2d at 536). Regardless, "under either measure of damages, [the] plaintiff[] must prove the actual value of the stock at the time of purchase." *Id.* (quotations marks, alterations, and citation omitted).

Here, Vicis seeks to recover its "out of pocket" losses—which is measured by the difference between the purchase price and the real or actual value of the property, *see Martin v. Brown*, 566 So. 2d 890, 891-92 (Fla. 4th DCA 1990). *See* Doc. 126 at 24. The purchase price of Vicis' investment is undisputed. However, Vicis has failed to set forth any evidence that would establish the real or actual value of the QHP Entities at the time of its investment in those entities.

Vicis asserts, first, that its expert, Edward Buttner, "concluded that Vicis' stock was worthless at the time of investment."[4]  Doc. 126 at 25.  Vicis overstates Buttner's opinion.  All Buttner has actually stated is that, just prior to Vicis' investment in QHP Group, QHP-FL was "statutorily insolvent" by approximately $100,000 and at risk of liquidation, and that "[t]he damages [he] [has] calculated consist of the actual Vicis investments of $30 million."  Doc. 118-1 ("Buttner Rpt.") at 18-19, 77-78, 82.  These statements, however, do not amount to an opinion that the actual value of the QHP Entities was $0 at the time of Vicis' investment.

*First*, Buttner's opinion that QHP-FL was statutorily insolvent and possibly facing liquidation is not equivalent to an opinion that the QHP Group/QHP-FL entities were "worthless." There is no evidence that statutory insolvency or risk of liquidation is equivalent to worthlessness, and, to the contrary, Buttner's Rebuttal/Supplemental Report suggests that such concepts are *not* in fact equivalent.  *See* Doc. 118-2 ("Buttner Rpt. II") at 26 ("had the FOIR been aware that QHP-FL was statutorily insolvent and that the Khans had filed materially false and misleading financial statements … and had FOIR taken action to remove the Khans, . . . it's likely that any value in QHP-FL (and QHP Group) would have been <u>materially diminished</u> *or* <u>eliminated</u>.") (emphases added).  Indeed, according to Buttner, it is entirely possible that, as a consequence of QHP Group/QHP-FL's statutory insolvency, there would have been only some material diminishment (as opposed to the total elimination) of the value of those entities.  Vicis points to no opinion that

---

[4] Fifth Third has moved to exclude certain of Buttner's opinions pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), including his opinions regarding causation and damages.  *See* Doc. 101.  For purposes of this order, however, the Court does not decide whether the opinions that have been specifically cited by Vicis in support of its opposition to Fifth Third's Motion for Summary Judgment must be excluded, but assumes *arguendo* that they are not excludable.

would establish which of the two possibilities would be the case here, or, in the case of a material diminishment in value, the extent to which the value would be diminished here.[5]

*Second*, it is clear that Buttner's purportedly "calculated" $30 million figure was not based on any actual valuation of the QHP Entities. The most striking record evidence that Buttner failed to actually valuate the QHP Entities in reaching his $30 million figure is the fact that, to arrive at this figure, he must have implicitly valued QHP Financial/QHP-NY at $0, but he otherwise wholly fails to address the value of QHP Financial/QHP-NY—which Vicis knew at the time of its 2009 investment were new companies with no assets or liabilities, *see* Stastney Dep. at 96-97.; Phillips Dep. at 50-51. Nowhere does Buttner ever directly state that QHP Financial/QHP-NY was worthless at the time of Vicis' investment or provide any explanation why that might be so. At oral argument, Vicis even conceded that Buttner "didn't really address New York separately," and that he would only say that "the management – it's the same management . . . . And he would say that they're demonstrated fraudsters." Doc. 184 at 103-04. At bottom, it is evident that Buttner's purportedly "calculated" $30 million figure was based only upon his opinion that the "investments

---

[5] The Court is aware that the record contains a declaration by Buttner that includes a valuation of QHP-FL (Doc. 155-1), which Fifth Third has moved to strike (Doc. 163). For purposes of Fifth Third's motion for summary judgment, the Court has not considered the declaration. The Court declines to consider the declaration for two reasons: *first*, the declaration was submitted to support Vicis' opposition to an unrelated motion—Fifth Third's *Daubert* motion to exclude Buttner's opinions, *see* Doc. 155-1—and not to support Vicis' opposition to Fifth Third's Motion for Summary Judgment; and *more importantly*, consideration of the Buttner declaration in relation to Fifth Third's Motion for Summary Judgment would be improper. It was submitted on April 2, 2015, after Vicis' deadline to submit materials in opposition to Fifth Third's Motion for Summary Judgment had already expired, *see* Docs. 110, 124 (requiring "all supporting evidentiary materials (counter-affidavits, depositions, exhibits, etc.)" to be filed by the deadline, which was extended to March 23, 2015).
The Court also declines to consider the deposition testimony of Edward Buttner (Doc. 182) or Vicis' notice of filing pinpoint citations to Buttner's deposition transcript (Doc. 183), as the transcript was filed after the operative summary judgment deadline had already expired and after oral argument on the motion for summary judgment. Vicis did not seek leave of the Court to belatedly file Buttner's declaration or deposition transcript.

would not have been made *but for* reliance on QHP-FL's false and misleading financial statements," Doc. 118-1 ("Buttner Rpt.") at 82 (emphasis added), and not because he actually attached any specific value to any of the QHP Entities.[6]

Vicis argues next that, even assuming Buttner has not offered any opinion as to the value of the QHP Entities, lay witnesses Phillips and Stastney can establish those entities' values. According to Vicis, Phillips was responsible for valuing the QHP Entities and monitoring Vicis' investments in those entities, *see* Doc. 128 ("Phillips Decl.") ¶¶ 4, 6, so he has the "particularized knowledge" to testify as to the QHP Entities' value (or lack thereof) under Federal Rule of Evidence 701.

The Court disagrees. It is true that, in certain circumstances, Federal Rule of Evidence 701 permits opinion testimony by business owners as to the value of his or her business. *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1222 (11th Cir. 2003). Specifically, Rule 701 provides that a lay witness who is the owner or officer of a business may "testify to the value or projected profits of the business . . . because of the particularized knowledge that the witness has by virtue of his or her position in the business," as long as such testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701 and advisory notes thereto. Thus, for example, in *Tampa Bay Shipbuilding*, the Eleventh Circuit found no error with the district court's decision to permit the plaintiff company's officers to testify as to the reasonableness of certain charges for repair work that the company had performed on a damaged ship. 320 F.3d at 1223.

---

[6] As further evidence that Buttner lacks any opinion as to the actual value of any of the QHP Entities, Buttner states that he believes that "any valuation would be entirely speculative." Doc. 118-2 ("Buttner Rpt. II") at 33.

10

Phillips does not qualify to offer a valuation opinion under Rule 701. *First*, Vicis has failed to explain how an allegedly statutorily insolvent HMO could be valued without "specialized knowledge within the scope of Rule 702," such as knowledge regarding the statutory minimum surplus capital requirements and the inner workings of FOIR—subjects specifically addressed by Buttner. *Second*, there is no evidence that, by virtue of Phillips' role as an owner or director of the QHP Entities, he possesses any particularized knowledge regarding the valuation of a statutorily insolvent QHP-FL. *Finally*, assuming *arguendo* that Phillips somehow gained some sort of particularized knowledge regarding the valuation of a statutorily insolvent QHP-FL, he does not even rely on any such knowledge to come to his conclusion that the QHP Entities were worthless at the time of Vicis' investment. Rather, Phillips bases his opinion only "upon what [he] [] learned through discovery" and what "Ed Buttner [] explained in his report." Phillips Decl. ¶¶ 7-8. It is thus clear that the valuation testimony Vicis seeks to offer through Phillips as a lay witness is actually expert testimony only admissible through Rule 702. *Accord Jones Creek Investors, LLC v. Columbia County, Georgia*, — F. Supp. 3d —, 2015 WL 1541409, at *7-8 (S.D. Ga. Mar. 31, 2015) (in a case for damages to a golf course, excluding the golf club's president's testimony regarding the amount of remediation damages because "he seeks to proffer as reasonable the estimates that third-party . . . experts produced based on their own 'scientific, technical or other specialized knowledge' . . . [and] not based on [his] day-to-day activities as general manager of the golf course.").

Citing *McDonald v. Bennett*, 674 F.2d 1080 (5th Cir. 1982) and *Getelman v. Levey*, 481 So. 2d 1236 (Fla. 3d DCA 1985), Vicis contends that, even apart from any valuation testimony offered by Buttner or Phillips, a jury could nevertheless conclude that the QHP Entities were worthless at closing. The Court disagrees. Neither *McDonald* nor *Getelman* persuasively support

Vicis' position. The Court recognizes that it appears that the *McDonald* Court permitted the jury to rely on the plaintiff's (presumably a lay witness) computations to establish his out of pocket losses for fraudulent inducement. *See McDonald*, 674 F.3d at 1090. *McDonald*, however, did not concern whether the plaintiff should have been permitted to offer such testimony in the first place; rather, it appears that the only issue challenged on appeal was whether the record supported the plaintiff's calculations. *See id.* Moreover, the stock's actual value of zero was supported by the defendant's own testimony.[7] *See id. Getelman* is similarly unpersuasive. There, the court did not discuss the issue of lay versus expert testimony, and held only that appraisals of the property at issue were properly admitted to establish the value of that property. *See Getelman*, 481 So. 2d at 1240.

Here, expert testimony would be necessary to establish the value of the QHP Entities at the time of Vicis' investment. *See Morgan Stanley*, 955 So. 2d at 1128 ("As a general rule, plaintiffs alleging securities fraud rely on expert proof to establish both the fact of damage and the appropriate method of calculation."); *see also Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (in a securities fraud case, "expert testimony is necessary in order to fix the amount—and indeed the existence—of actual damages"); *In re Moyer*, 421 B.R. 587, 596 (Bankr. S.D. Ga. 2007) ("Valuation of closely-held companies, is beyond the understanding of lay persons."). Indeed, it is unclear how, solely on the basis of fact testimony, a jury would be able to properly valuate, for example, Vicis' 20% stake in QHP-FL, a Florida HMO that was allegedly statutorily insolvent and subject to some unspecified risk of liquidation by FOIR, but that also had thousands

---

[7] The Court also notes that *McDonald* is also not binding precedent because it was handed down on May 7, 1982. *See Bonner v. City of Prichard, Alabama*, 661 F.2d 1206 (11th Cir. 1981) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to September 30, 1981).

of paying members and contracts, *see* Stastney Dep. at 88-90. *See Sun Ins. Marketing Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1244-45 (M.D. Fla. 2003) ("The value of a business depends upon the facts unique to that business and therefore appraisals tend to be factually intensive involving competing valuation methodologies. . . . Usual factors to be considered are: net worth . . . ; evidence of recent sales of similar businesses or blocks of stock of similar businesses; whether the corporation is regularly traded on an exchange, is closely held or its stock has been traded at arms' length in close proximity to the valuation date; historic and prospective earning power and dividend-paying capacity; good will; position in the industry; management; and the economic outlook of the industry.").

In sum, there is no evidence upon which a jury may determine the amount of damages, if any, suffered by Vicis as a result of the alleged fraud. Vicis has failed to present evidence as to the actual value of the QHP Entities at the time of its investment in those entities. Without evidence of the actual value, Vicis cannot prove its damages, an essential element of fraud, which must be established to recover for aiding and abetting fraud or conspiracy to commit fraud. Fifth Third is therefore entitled to summary judgment in its favor as a matter of law.[8] *See Minotty v. Baudo*, 42 So. 3d 824, 835 (Fla. 4th DCA 2010) ("Without proof of actual damage the fraud is not actionable."); *see also Teca, Inc. v. WM-TAB, Inc.*, 726 So. 2d 828, 830 (Fla. 4th DCA 1999) (entering judgment for the defendants "[b]ecause there was no proof . . . under the correct measure of damages").

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED**:

---

[8] In so concluding, the Court need not (and does not) address the balance of Fifth Third's arguments. The Court also need not (and does not) decide Fifth Third's Motion to Strike Inadmissible Materials Submitted in Opposition to Summary Judgment (Doc. 164), because, regardless of whether the Court can properly consider the challenged materials, Fifth Third is still entitled to judgment in its favor.

1. Defendant's Motion for Summary Judgment (Doc. 104) is **GRANTED**.

2. The Clerk is directed to terminate all pending motions and deadlines, enter judgment in favor of Defendant Fifth Third Bank and against Plaintiff Caledonian Bank & Trust Limited, as trustee for and on behalf of Vicis Capital Master Fund, and close this case.

**DONE AND ORDERED** in Tampa, Florida on September 18, 2015.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any